United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 27, 2007**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 06-30108

UNITED STATES OF AMERICA

Plaintiff - Appellee

VERSUS

DONALD CRAIG SCROGGINS

Defendant - Appellant

Appeal from the United States District Court
For the Western District of Louisiana

Before DAVIS, DENNIS and PRADO, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Defendant Donald Craig Scroggins ("Scroggins") appeals his conviction and sentence for conspiracy to possess with intent to distribute five (5) kilograms or more of powder cocaine and fifty (50) grams or more of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Finding no error, we AFFIRM the judgment of the district court in all respects.

I. Facts and Proceedings Below

This case is before us for the third time. Scroggins was convicted by a jury of conspiracy to distribute and possession with intent to distribute five (5) kilograms or more of cocaine hydrochloride (powder cocaine) and fifty (50) grams or more of cocaine base (crack cocaine) in violation of 21 U.S.C. §§ 841(a)(1) and 846. Scroggins filed a timely motion for new trial, pursuant to Fed. R. Crim. P. 33, asserting that the government intimidated two defense witnesses, James Thomas ("Thomas") and Freddie Young ("Young"), from testifying, and that, inter alia, the "interest of justice" required that he be granted a new trial. The district court treated Scroggins's motion as one based on newly discovered evidence and governmental interference, and denied the motion.

Scroggins was then sentenced to life imprisonment, five years' supervised release, and a $100 special assessment. At sentencing, the district court made a number of findings based almost entirely on the trial testimony of government witness Earl Buchanan ("Buchanan"). The court found that (1) Scroggins's conspiracy conviction involved more than 1.5 kilograms of crack cocaine; (2) Scroggins had obstructed justice; and (3) Scroggins was a dealer or organizer of a drug organization with five or more participants. This produced an unadjusted base offense level of 38,[1] to which the court added four levels for being a leader or organizer[2] and two

---

[1] U.S.S.G. § 2D1.1(c)(1).

[2] U.S.S.G. § 3B1.1(a).

levels for obstruction of justice,[3] for a total adjusted base offense level of 43.[4] Under the Guidelines, this produces a Guideline sentence of life imprisonment for an individual, such as Scroggins, in criminal history category I.[5]

On Scroggins's timely appeal to this court, we remanded the case to the district court for further consideration of Scroggins's motion for new trial "in the interest of justice."[6] We also directed the district court to conduct an <u>in camera</u> inspection of the presentence reports ("PSRs") for Buchanan and Gregory Byrd ("Byrd"), two prosecution witnesses, to determine whether they contained any <u>Brady</u> or <u>Giglio</u> information, and, if so, to determine whether the failure to produce that information was harmless.[7]

In his first appeal, Scroggins also argued that Buchanan's trial testimony did not bear a "sufficient indicia of reliability" upon which to base a life imprisonment sentence.[8] Scroggins's principal contention focused on the district court's finding (based

---

[3]U.S.S.G. § 3C1.1.

[4]Actually, the adjusted base offense level would be 44, but the U.S.S.G. Sentencing Table, application note 2, provides that "[a]n offense level of more than 43 is to be treated as an offense level of 43."

[5]U.S.S.G. Sentencing Table.

[6]<u>United States v. Scroggins</u>, 379 F.3d 233, 256-57 (5th Cir. 2004) ("<u>Scroggins I</u>"). We found that the district court's conclusion that the government did not interfere with Thomas and Young was not clearly erroneous. <u>Id.</u> at 239.

[7]<u>Id.</u> at 264.

[8]<u>See</u> U.S.S.G. § 6A1.3(a).

3

on Buchanan's testimony) that Scroggins was involved in a conspiracy that dealt in more than 1.5 kilograms of crack cocaine.[9] We concluded "that the district court did not sufficiently scrutinize Buchanan's inconsistent statements[10] and did not provide a rationale in the record for believing one version over another."[11] As a result, we vacated Scroggins's sentence as to the quantity of crack cocaine, and remanded the case for resentencing with respect to the quantity of crack cocaine.[12]

Scroggins applied to the Supreme Court for a writ of certiorari, which the Supreme Court granted. The Court remanded the case to us so we could consider the sentence in light of <u>United States v. Booker</u>.[13] Consistent with the Supreme Court's order, we remanded the case to the district court. In our remand order to the district court, we explained that:

> Resentencing herein shall be pursuant to Justice Breyer's <u>Booker</u> opinion, with Scroggins and counsel present and

---

[9]Scroggins also argued that Buchanan's testimony supporting the obstruction of justice enhancement was unreliable. We rejected this contention. <u>Scroggins I</u>, 379 F.3d at 265.

[10]Buchanan's versions of the amount of crack cocaine for which Scroggins was responsible included: (1) trial testimony of at least 1.05 kilograms, but with Buchanan unable to know the approximate total amount (more than fifty grams from Shirley Preston ("Preston") and David Sosa ("Sosa")); and (2) information given to Drug Enforcement Administration ("DEA") Agent William Green of about three kilograms.

[11]<u>Id.</u> at 267-68.

[12]<u>Id.</u> at 269. Of course, resentencing would not be appropriate if the district court first set aside Scroggins's conviction.

[13]<u>Scroggins v. United States</u>, 543 U.S. 1112 (2005).

4

having, <u>inter</u> <u>alia</u>, an opportunity to speak under Fed. R. Crim. P. 32(4)(A). The district court may, should it deem it appropriate, reconsider its determinations that Scroggins was a leader or organizer and/or obstructed justice, as well as its drug quantity determinations, and it <u>shall</u> evaluate the ultimate sentencing effect of any and all such determinations under an advisory, non-mandatory, guidelines system. We also note in this connection that in respect to all these three determinations as made at the original sentencing, the district court relied largely on the trial testimony of Buchanan.

We hold that, under the particular circumstances of this case, the district court may also, in its discretion, hear and consider evidence as to Scroggins's role in the offense under section 3B1.1 of the Guidelines and whether he obstructed justice under section 3C1.1 of the Guidelines. The court may also hear evidence bearing on whether or not - notwithstanding that the Guidelines (and pertinent Sentencing Commission policy statements) must be considered and taken into account - a non-guideline sentence would be more appropriate in light of the other factors and considerations set out in Justice Breyer's <u>Booker</u> opinion.[14]

Accordingly, we modified our opinion in <u>Scroggins I</u>, vacated Scroggins's sentence, and remanded the case to the district court for further proceedings.[15]

Approximately 45 days after remand, and without further notice or hearing, the district court denied Scroggins's motion for new trial based on the interest of justice. After receiving notice of the district court's ruling, Scroggins filed a motion to disqualify the district judge, pursuant to 28 U.S.C. §§ 144 and 455, which the

---

[14]<u>United States v. Scroggins</u>, 411 F.3d 572, 577-78 (5th Cir. 2005) (emphasis in original) ("<u>Scroggins II</u>").

[15]<u>Id.</u> at 578.

5

district court denied.  At the same time, Scroggins filed a motion to reconsider the denial of his new trial motion with a request that the district court take evidence on the motion, which was also denied by the district court.

Prior to resentencing, Scroggins filed objections to each of the enhancements and asserted reasons under 18 U.S.C. § 3553(a) for a reduced sentence.  At resentencing, the district court overruled Scroggins's objections to the enhancements for obstruction of justice and leadership role, but, after hearing the testimony of witnesses, it reconsidered the amount of drugs and reduced the amount of crack cocaine involved to just over one kilogram.  The resulting offense level 42, with a criminal history category I, yielded an advisory Guideline range of 360 months to life.[16]  The court sentenced Scroggins to 360 months.  Scroggins timely appealed.

## II.  Discussion

Scroggins raises several issues on appeal.  We address each issue in turn.

### A.  Recusal

In his first assignment of error, Scroggins argues that the district judge erroneously refused to recuse himself pursuant to 28 U.S.C. §§ 144 and 455.  We review the denial of a motion to recuse

---

[16]U.S.S.G. Sentencing Table.

6

under an abuse of discretion standard.[17]

Two affidavits were submitted with the motion for recusal, one from Scroggins and one from his attorney. Both Scroggins and his attorney based their assertions of bias largely on a phone call from the district court, through its law clerk. According to the affidavits, the law clerk informed Scroggins's counsel that Judge Walter, the district court judge, had denied Scroggins's new trial motion and that he intended to give Scroggins the same sentence. The law clerk then inquired as to whether Scroggins was interested in waiving his appearance at sentencing. According to the affiants, the court expressed concern over the expense to the government of transporting Scroggins for resentencing when the same sentence would issue. Scroggins's counsel declined to waive Scroggins's presence at the sentencing hearing.

Scroggins also alleged that Judge Walter had predetermined his sentence without hearing any argument as to why the sentence was "unreasonable" under Booker, without giving Scroggins's counsel an opportunity to speak, and without scrutinizing the drug amounts. In addition, Scroggins complained of the district court's failure to hold a hearing on the new trial motion, and its failure to review the PSRs of Buchanan and Byrd.[18]

---

[17]United States v. Waskom, 179 F.3d 303, 307 (5th Cir. 1999).

[18]Scroggins also alleged that recusal was required because the court imposed an extremely large fine on his trial counsel "without any of the benefits of due process."

Two statutes govern recusal of United States district judges based on the judge's bias, prejudice, or impartiality.[19] "Under either statute, the alleged bias must be personal, as distinguished from judicial, in nature."[20] "[A] motion for disqualification ordinarily may not be predicated on the judge's rulings in the instant case . . . ."[21] Adverse judicial rulings will support a claim of bias only if they reveal an opinion based on an extrajudicial source or if they demonstrate such a high degree of antagonism as to make fair judgment impossible.[22]

Scroggins's recusal arguments rely largely on the district court's rulings, or the lack thereof, in his case, and the phone call from the court's law clerk. With respect to the phone call, Scroggins's argument that the call demonstrated that the district court "predetermined" his sentence, and thus, erred in refusing to recuse himself is meritless.[23] The facts as stated by Scroggins do

---

[19]28 U.S.C. §§ 144, 455. Under Section 144, a judge must reassign a case when a party "makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice," either against him or in favor of any adverse party. Section 455(a) requires that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

[20]Phillips v. Joint Legislative Committee on Performance & Expenditure Review, 637 F.2d 1014, 1020 (5th Cir. 1981) (internal quotations omitted).

[21]Id. at 1020.

[22]See Liteky v. United States, 510 U.S. 540, 555 (1994).

[23]Scroggins cites two Third Circuit cases in support of his argument. United States v. Townsend, 478 F.2d 1072 (3d Cir. 1973), and United States v. Thompson, 483 F.2d 527 (3d Cir. 1973), are distinguishable from Scroggins's situation because they involved a district court judge

8

not demonstrate bias and impartiality that are personal - as distinguished from judicial - in nature. As a result, we cannot say that the district judge abused his discretion in denying Scroggins's recusal motion.

## B. Motion for New Trial

Scroggins next argues that the district court erred by failing to hold a hearing on remand before ruling on the new trial motion, and, in any event, that a new trial was warranted in the interest of justice.

### 1. Failure to Hold a Hearing

In Scroggins I, although the district court declared in its ruling on the new trial motion that it had "already determined in open court that the testimony Young and Thomas were to provide is material," we found that "it did not make any other reference to its materiality determination or to findings upon which it based its conclusion that their testimony was material."[24] In addition, with respect to Thomas's testimony at the new trial hearing,[25] the

---

who had a personal bias against Selective Service violators, such that he would sentence all violators of the Selective Service laws to at least thirty months in jail, despite the fact that a prison sentence was not mandatory. Scroggins has pointed to no personal bias of the judge against Scroggins and/or individuals convicted of drug offenses generally. In addition, a defendant is entitled to voluntarily waive his presence at a sentencing hearing, see Fed. R. Crim. P. 43(c), and, thus, the fact that the judge asked if Scroggins wanted to waive his presence does not indicate personal bias or prejudice.

[24]Scroggins I, 379 F.3d at 257.

[25]Before Scroggins's initial appeal and before we remanded the case to the district court, the district court held a hearing on Scroggins's new trial motion.

9

district court did not allow Scroggins to fully develop the substance of Thomas's testimony beyond the governmental interference issue. Based on this background, we stated in <u>Scroggins I</u> that, "in considering Scroggins's new trial motion in the interest of justice on remand, the district court <u>may</u> need to hold a further hearing (if <u>timely and properly requested</u> to do so by either party)."[26]

On remand, the district court did not issue a scheduling order or announce its intention to rule on the new trial motion without any further input from the parties. Scroggins cites no rule that requires such notice of intent to rule. The district court issued its ruling denying Scroggins's motion for new trial 45 days after we issued our opinion in <u>Scroggins II</u>, and after it had received no request for a hearing from Scroggins. Also, in his motion to reconsider the denial of the new trial motion, Scroggins did not proffer statements from Thomas and Young to support his argument that a hearing was necessary. Additionally, Scroggins did not attempt to refute the district court's conclusion in its ruling on remand denying Scroggins's new trial motion that the testimony of Young and Thomas was not sufficiently credible to warrant a new trial. The district court did not err in concluding that a hearing on the new trial motion was not warranted.

### 2. Denial of Motion for New Trial

---

[26]<u>Id.</u> at 258 (emphasis added).

10

Following trial, Scroggins moved for a new trial, pursuant to Fed. R. Crim. P. 33, asserting, _inter alia_, that the "interest of justice" required that he be granted a new trial.  In his motion, Scroggins argued that two defense witnesses, Young and Thomas, who, although subpoenaed by Scroggins, did not appear to testify at trial, would have provided exculpatory testimony.  At the new trial hearing,[27] the witnesses gave testimony which tended to contradict the testimony of Buchanan, a key government witness.

Under Rule 33 of the Federal Rules of Criminal Procedure, the district court "may . . . grant a new trial if the interest of justice so requires,"[28] and "[t]he 'interest of justice' may be based on the trial judge's evaluation of witnesses and weighing of the evidence."[29]  A motion for new trial "is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial . . . should be invoked only in exceptional cases . . . ."[30]  "Where a court finds that a miscarriage of justice may have occurred at trial, . . . this is classified as such an 'exceptional case' as to warrant granting a

---

[27]Again, this is the hearing conducted prior to Scroggins's initial appeal.

[28]Fed. R. Crim. P. 33(a).

[29]United States v. Wall, 389 F.3d 457, 465-66 (5th Cir. 2004).

[30]United States v. Robertson, 110 F.3d 1113, 1120 n. 11 (5th Cir. 1997) (citation omitted).

11

new trial in the interest of justice."[31] "A miscarriage of justice warranting a new trial in certain circumstances may occur even when there has been no specific legal error."[32] We review the denial of a motion for new trial for abuse of discretion.[33]

In Scroggins I, we stated that

the district court should grant the new trial only if it concludes, in the exercise of its discretion, either that the jury probably would have acquitted Scroggins with the testimonies of Young or Thomas, rather than simply that the jury might have acquitted, or that had Young and Thomas testified the evidence would so heavily preponderate against the verdict that it would be a miscarriage of justice to let it stand.[34]

On remand, the district court denied Scroggins's new trial motion. In so ruling, the district court stated that Buchanan testified at length on cross-examination regarding the facts surrounding his agreement with the government to offer favorable testimony at Scroggins's trial in exchange for a reduced sentence. In addition, the district court relied on a contemporaneous letter Buchanan directed to Scroggins, asking Scroggins to plead guilty and tell the truth.[35] The court found that "these letters bolstered

---

[31]Id. (citation omitted).

[32]Scroggins I, 379 F.3d at 255.

[33]United States v. Rasco, 123 F.3d 222, 228 (5th Cir. 1997).

[34]Scroggins I, 379 F.3d at 257 (internal citations omitted) (emphasis in original).

[35]Buchanan wrote a letter to Bobbie Young ("Young"), an individual housed at Caddo Correctional Center. Buchanan testified that he wrote the letter to Young with the purpose that Young would convey his words to Scroggins. Buchanan stated that in the letter he was telling Scroggins to tell the truth by pleading guilty and accepting responsibility for what he did.

12

Buchanan's credibility with the Court." The court stated that it "watched Buchanan very closely during the course of his testimony due to a general distrust of evidence 'purchased' by the government" and found the evidence brought forth at trial "sufficient to make Buchanan believable."

The court explained that in previously referring to Thomas's and Young's evidence as "material" or "important," it was "assum[ing] those factors for the purpose of the hearing on governmental misconduct." The court emphasized that it "had the opportunity to observe Young and Thomas at the hearing on the question of government misconduct and found them incredible." As a result, the district court stated that "after hearing the proffered substantive testimony of Young and Thomas . . ., [it] certainly did not find their testimony to be sufficiently credible such that the jury probably would have acquitted Scroggins had they testified during the trial." The district court also concluded that "with the additional testimony of Young and Thomas, the evidence would not preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand."

At trial, Buchanan testified that Scroggins was purchasing drugs from David Sosa ("Sosa") and Shirley Preston ("Preston");

---

Buchanan stated that, by doing this, it would benefit Buchanan because it would confirm the truth as Buchanan had already stated it and it would benefit Scroggins because it would be possible for him to receive a Rule 35 in his sentence.

Scroggins "financially supplied" the drugs;[36] and Buchanan sold the drugs for Scroggins.

At the new trial hearing, Young, a former paid government informant, testified that (1) Buchanan told him that Scroggins never dealt with Sosa, and that Sosa was supplying Buchanan with drugs; (2) Buchanan told him that he (Buchanan) initially told the Drug Enforcement Administration (the "DEA") agents that Scroggins was not a drug dealer, but "they didn't want to hear that," and the only way Buchanan would get "some help" in reducing his sentence would be to "cooperate with them to the fullest;" (3) Buchanan got mad at Scroggins for not hiring him (Buchanan) a paid lawyer; (4) Buchanan told him Scroggins never supplied him (Buchanan) with drugs or money to buy drugs; and (5) from his (Young's) knowledge and information gathered on the street for the DEA, Scroggins was not a drug dealer.

Thomas, a former paid confidential informant who was asked by DEA Agent Russell Sarpy to attempt to buy drugs from various members of the Scroggins family (including Buchanan), testified at the new trial hearing that: (1) he told Sarpy that Scroggins "don't sell drugs," but the agents wanted him to attempt to purchase drugs from Scroggins anyway; and (2) when he asked Scroggins for drugs, Scroggins said, "You know I don't do that."

After conducting a careful review of the record in this case,

---

[36]Buchanan testified that this meant that Scroggins was purchasing the drugs.

we are satisfied that the district court did not err in finding that the testimony of Young and Thomas would not have likely undermined the jury's verdict. Scroggins produced considerable testimony during trial attacking Buchanan's credibility.[37] The defense also presented evidence that Buchanan bought his drugs from Sosa and Ashley, and that Scroggins never supplied Buchanan with drugs.[38] In addition, contrary to the testimony of Young and Thomas, the government presented considerable evidence of Scroggins's drug dealing such that the jury <u>probably</u> would not have acquitted Scroggins had Young or Thomas testified. Also, the district court did not err in concluding that it was not a

---

[37]In addition to Buchanan's testimony on cross-examination regarding the facts surrounding his agreement with the government, defense witness Russell Jones ("Jones"), an inmate who worked in the prison law library, testified that Buchanan told him that his people were not "providing the legal services that he felt like he deserved," and "all of his people would go down with him and he didn't mind fabricating some stuff to do what he had to do." Jones also stated that Buchanan indicated to him that he knew if he said what they wanted him to say, he would "come home." Moreover, Jones testified that Scroggins told him that he was not a dope dealer and that "Earl [Buchanan] lied on" him.

[38]Bobbie Kirkendoll ("Kirkendoll") testified that Buchanan told him that Ashley supplied him (Buchanan) with drugs and Buchanan never mentioned getting drugs from anywhere else. According to Kirkendoll, Buchanan also stated that he was also buying drugs from "a Mexican guy that he knew." (Sosa was allegedly a Mexican.) In addition, Kirkendoll stated that it was "impossible" that Buchanan would have been supplied with drugs in such large amounts from Scroggins because Scroggins was a crack addict. Richard Scroggins ("Richard") testified that he did not know if Scroggins knew anything about Sosa, but Buchanan did, and Scroggins was trying to help Agent Green catch Sosa to help Buchanan "[b]y getting information from [Buchanan] to give to Mr. Green to catch Sosa, because he got the phone number [for Sosa] from [Buchanan]." Agent Green testified that Scroggins and other people told him that Buchanan had drug connections and had done drug business with Sosa. William Bryant, who was called by co-defendant James Bryant, testified that "he's never known [Scroggins] to sell drugs," and Scroggins is a drug addict and "it's very difficult for an addict to be productive selling drugs or make money selling drugs . . . ."

15

miscarriage of justice to let the verdict stand without the testimony of these two witnesses.[39]

In addition to Buchanan's testimony, Agent William Green, a Special Agent with the DEA, testified that Scroggins told him that he was a cocaine dealer, had been getting cocaine from Sosa, and that "he had set up or could set up David Sosa to bring in . . . cocaine to the Shreveport area."[40] At a later meeting, Scroggins admitted to Agent Green that "30 days prior to him coming to our office he had already set up the 10 kilogram cocaine deal with Mr. Sosa," and this "was going to be his last narcotics deal and that was going to set his retirement."

Gregory Byrd ("Byrd"), a government witness, testified at trial that, in 1998, Scroggins bought drugs from him on credit, and toward the end of 1998 to the first part of 1999, Byrd began buying drugs from Scroggins. Byrd testified that he and Scroggins "did business" for about a year, but they stopped doing business in 2000 because that was when Scroggins started using Buchanan to sell his drugs, and Byrd did not "want to mess around with [Buchanan]." Byrd stated that on occasions when he called Scroggins and Scroggins attempted to send him to Buchanan, he did not go to

---

[39]See Scroggins I, 379 F.3d at 257 (internal citations omitted) (emphasis in original).

[40]Scroggins, who was already under investigation at the time, met with Agent Green multiple times and discussed his previous drug trafficking experience and offered to set up the controlled buy with Sosa, allegedly in order to benefit Buchanan, a man informally adopted by Scroggins, who was arrested for drug trafficking.

Buchanan and dealt directly with Scroggins.

Vincent Crawford ("Crawford") testified that he did drug business with Scroggins between 1998 and 2001, and he bought drugs directly from Scroggins about seven or eight times.[41]  Crawford stated that sometimes Scroggins would direct him to someone else for the transaction and sometimes that person would be Buchanan.

In sum, we conclude that the district court did not abuse its discretion in denying Scroggins's motion for new trial.

### C.  Burden of Proof for Relevant Conduct

Scroggins next argues that the relevant conduct in his case should be determined under a standard greater than a preponderance of the evidence because the relevant conduct is the "tail that wags the dog" of the substantive offense.[42] We have repeatedly held that a district court may find the facts relevant to a defendant's Guidelines calculation by a preponderance of the evidence, and thus, we reject Scroggins's argument.[43]

### D. Leadership Enhancement

On remand, Scroggins argued that he did not qualify for a

---

[41]Crawford also testified that around the summer of 1999, Scroggins contacted him on several occasions because he knew that Crawford was a drug dealer and told Crawford that he bought some drugs from out of town, and asked Crawford what he was looking for, and how much he usually scored.  Scroggins gave Crawford a price range and they "went on from there."

[42]See United States v. Harper, 448 F.3d 732, 734 n.1 (5th Cir. 2006) (noting in a footnote "that the district court did not reason and Harper does not contend that the magnitude of the sentencing enhancement amounted to a 'tail that wags the dog of the substantive offense' thereby requiring the use of a more stringent standard of proof" (citations omitted)).

[43]See, e.g., United States v. Johnson, 445 F.3d 793, 798 (5th Cir. 2006).

17

leadership enhancement under U.S.S.G. § 3B1.1, and he submitted additional information on this issue. However, the district court found that Scroggins was a leader and deserving of the four-level increase. We review the district court's finding for clear error.[44]

A defendant qualifies for a leadership adjustment if he is the organizer or leader of a criminal activity that involved five or more participants.[45] Scroggins's PSR contained two bases that support a leadership enhancement: (1) an investigation that revealed that Scroggins was the head of the "Lakeside Kings" street gang, a Shreveport gang consisting of about twenty-seven members; and (2) the identification of Gregory Byrd, Vincent Crawford, John Bryant, Earl Buchanan and Vincent Tate as members of an illegal drug distribution organization that was led by Donald Scroggins from at least 1990 until March of 2001.

In his sentencing memorandum, Scroggins attached the declaration of Corporal Ted Smith, a Shreveport police officer in charge of gang intelligence and responsible for maintaining intelligence on street gangs and street gang activity in Shreveport. Corporal Smith stated in his declaration that, to his knowledge, Scroggins has never been a member of the Lakeside Kings, much less the head of that gang, and that, given his responsibilities at the Shreveport Police Department, he would be

---

[44]United States v. Okoli, 20 F.3d 615, 616 (5th Cir. 1994).

[45]U.S.S.G. § 3B1.1(a).

18

aware of whether or not Scroggins was a member of that gang. The PSR did not indicate the source or provide details of the investigation revealing Scroggins's link to the Lakeside Kings, and the government did not introduce any testimony at trial or the resentencing hearing regarding the gang. As a result, the evidence was insufficient to support the district court's finding that Scroggins was the head of the Lakeside Kings.

We find, however, that any error of the district court in relying on Scroggins's association with the Lakeside Kings[46] is harmless because the information contained in the PSR and the testimony at trial was adequate for the district court to find by a preponderance of the evidence that Scroggins was a leader in a drug conspiracy consisting of five or more individuals, including Buchanan, Bryant, Byrd, Crawford, and Tate. Accordingly, we conclude that the district court did not clearly err in imposing the four-level leadership enhancement.

E. Reasonableness of Sentence

Scroggins argues that, given the record from the district court at resentencing, it would be almost impossible for us to conduct a meaningful review for reasonableness, and a consideration of the factors set forth in 18 U.S.C. § 3553(a) reveals that a 360 month sentence is not reasonable.

---

[46]At the resentencing hearing, the district court made no mention of the Lakeside Kings, only stating that it "already found the five," and those are the ones in the PSR.

19

Under Booker, we review sentences for reasonableness. A sentence within a properly calculated Guideline range "is afforded a rebuttable presumption of reasonableness."[47] When a district court sentences a defendant within a properly calculated Guideline sentencing range, we will infer that the district judge has considered "all the factors for a fair sentence set forth in the Guidelines"[48] In evaluating whether a sentencing Guideline range is properly calculated, we review findings of fact for clear error and the interpretation and application of the sentencing Guidelines to those facts de novo.[49]

In this case, the district court sentenced Scroggins within a properly calculated Guideline range, and in fact, it sentenced him to the shortest sentence in that range, 360 months. We are satisfied that the district court provided adequate explanation in imposing this sentence[50] and considered the § 3553(a) factors in

---

[47]United States v. Smith, 440 F.3d 704, 706 (5th Cir. 2006). Scroggins maintains that a properly calculated Guideline range should not be afforded a rebuttable presumption of reasonableness. While Scroggins acknowledges that he is bound by this presumption on panel review, he preserves this argument for en banc or Supreme Court review. The Supreme Court has recently granted certiorari to decide the issue of whether a within-Guidelines sentence is, in fact, presumptively reasonable. See United States v. Rita, 177 Fed. Appx. 357 (4th Cir.) (unpublished), cert. granted, 127 S. Ct. 551 (Nov. 3, 2006).

[48]United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005).

[49]Smith, 440 F.3d at 705.

[50]See Mares, 402 F.3d at 519 (When a judge exercises his "discretion to impose a sentence within the Guideline range and states for the record that she is doing so, little explanation is required.").

sentencing Scroggins.[51] In addition, after reviewing the briefs and the record and finding no persuasive reason to disturb the district court's sentence, we are convinced that Scroggins's sentence is reasonable under <u>Booker</u>.

## F. Review of Presentence Reports

Scroggins asks us to conduct an independent review of the PSRs of Buchanan and Byrd to determine whether they contain any material <u>Brady</u>[52] or <u>Giglio</u>[53] information. Prior to trial, Scroggins requested that the government produce the PSRs for Buchanan and Byrd that had been produced in connection with their drug prosecutions. The district court denied his request without indicating whether it had conducted an <u>in camera</u> review of the PSRs and without making the PSRs a part of the record. In remanding the case, we instructed the district court to conduct an <u>in camera</u> inspection and make appropriate findings as to whether the PSRs contained any material <u>Brady</u> or <u>Giglio</u> information. On remand, the district court conducted an <u>in camera</u> inspection and found no material <u>Brady</u> or <u>Giglio</u> information.

Our own independent review confirms the district court's conclusion and, thus, we find no error in the district court's disposition of this issue.

---

[51] <u>See</u> <u>id.</u> at 519.

[52] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

[53] <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

21

### III.  Conclusion

For the foregoing reasons, Scroggins's conviction and sentence are affirmed.

AFFIRMED.